Bourgeois v. LaPelusa, 2025 NCBC 16.

STATE OF NORTH CAROLINA

IREDELL COUNTY

SHANE BOURGEOIS and PITBOX
AUTO SALES LLC,

        Plaintiffs,

    v.

JAMES MATTHEW LAPELUSA, JR.;
BRIAN PERRY; RALPH ERSKINE
STEVENSON III; THE PIT BOX, LLC;
and AMERICAN AUTOMOTIVE
GROUP, INC.,

        Defendants.

IN THE GENERAL COURT OF JUSTICE

SUPERIOR COURT DIVISION

21 CVS 89

**ORDER AND FINAL JUDGMENT**

1. **THIS MATTER** comes before the Court on Defendants' Motion to Confirm Arbitration Award and Enter Judgment pursuant to N.C.G.S. § 1-569.22 (Motion to Confirm), (ECF No. 54).

2. Plaintiffs originated this matter by filing a Complaint on 13 January 2021. (Compl., ECF No. 3.)

3. On 15 January 2021, the case was designated as a mandatory complex business case by Order of the Chief Justice of the North Carolina Supreme Court pursuant to Section 7A-45.4(a) of the North Carolina General Statutes. (Designation Order, ECF No. 1.) It was reassigned from the Honorable Michael L. Robinson to the undersigned on 6 May 2021. (Reassignment Order, ECF No. 20.)

4. On 23 September 2022, the Court entered an Order and Opinion granting in part and denying in part Defendants' Motion to Dismiss and denying Plaintiffs' Motion to Amend. *See Bourgeois v. Lapelusa*, 2022 NCBC LEXIS 111 (N.C.

Super. Ct. Sept. 23, 2022). Thereafter, the parties jointly moved for an order referring the case to arbitration. (Joint Mot. for Order Referring Case to Arbitration, ECF No. 46.)

5. On 21 August 2023, the Court granted the parties' motion and entered a Consent Order referring this matter to arbitration (the Consent Order), (ECF No. 48.) The parties stipulated that the Pit Box, LLC was judicially dissolved and that only the following issues remained for consideration and decision by the Arbitrator:

(1) Whether any of the Defendants were unjustly enriched to the detriment of Plaintiff Shane Bourgeois or The Pit Box, LLC;

(2) Whether Plaintiff Shane Bourgeois or Pit Box Auto Sales, LLC is liable to Defendants, or any of them, under the Counterclaims made by Defendants pending in this action; and

(3) A plan to wind up The Pit Box, LLC pursuant to Article 6, Chapter 57D of the North Carolina General Statutes.

(Consent Order ¶ 2(C)(ix).)

6. The parties designated Chase Saunders as Arbitrator in accordance with the Consent Order.

7. After reviewing documentary evidence and hearing testimony, Mr. Saunders issued an Arbitration Award (Award) on 15 November 2024. A true and correct copy of the Award is attached as Exhibit A and incorporated herein.

8. Addressing the first issue, the Arbitrator ruled that Defendants had not been unjustly enriched to the detriment of Plaintiff Shane Bourgeois or The Pit Box, LLC.

9. Addressing the second issue, the Arbitrator ruled in favor of The Pit Box, LLC with respect to its counterclaims and ordered Shane Bourgeois to pay

compensatory damages in the amount of $217,191.39 to The Pit Box LLC, with interest accruing at the North Carolina statutory rate of 8% per annum after judgment is entered until paid.

10. The Arbitrator denied all remaining claims.

11. As for a plan to wind up The Pit Box, LLC resulting from its judicial dissolution, the Arbitrator determined that The Pit Box, LLC's total assets consist of its entitlement to recover $217,191.39 from Shane Bourgeois and some tools valued at $10,750.00, for a total of $227.941.39. From that amount, the Arbitrator directed that The Pit Box, LLC repay a loan of $34,288.00 to Shane Bourgeois and a loan of $89,267.49 to American Automotive Group, Inc. The Arbitrator divided the tools equally between Shane Bourgeois and Brian Perry and then directed payment of $5,375.00 to James Lapelusa, Jr.

12. After accounting for the amounts distributed in dissolution, the net amount Shane Bourgeois is liable to The Pit Box, LLC for is $153,483.09.

13. The Arbitrator concluded that there are no remaining assets available for the satisfaction of other claims or for distribution.

14. On 22 November 2024, Plaintiffs filed an objection to the Motion to Confirm opposing entry of a judgment on the Award pending the Arbitrator's ruling on Plaintiffs' simultaneously filed Motion to Amend that Award. (Obj., ECF No. 56.)

15. On 17 December 2024, Defendants filed the Arbitrator's Order denying Plaintiffs' Motion to Amend. (Not., ECF No. 58.)

16. This proceeding is governed by the North Carolina Revised Uniform Arbitration Act, N.C.G.S. §§ 1-569.1 *et seq.* The confirmation of an arbitration award is subject to N.C.G.S. § 1-569.22, which states:

> After a party to an arbitration receives notice of an award, the party may make a motion to the court for an order confirming the award. Upon motion of a party for an order confirming the award, the court shall issue a confirming order unless the award is modified or corrected pursuant to [N.C.]G.S. 1-569.20 or [N.C.]G.S. 1-569.24 or is vacated pursuant to [N.C.]G.S. 1-569.23.

N.C.G.S. § 1-569.22. Having received no motion to modify, correct, or vacate the Award, the Court concludes that confirmation of the Award is warranted.

17. In addition, section 1-569.25(a) of the North Carolina General Statutes provides that "upon granting an order confirming . . . an award, the court shall enter a judgment in conformity with the order. The judgment may be recorded, docketed, and enforced as any other judgment in a civil action."

18. Based on the foregoing, the Court concludes that the Motion to Confirm should be **GRANTED**.

19. **THEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED** that the Motion to Confirm is **GRANTED**, the Award attached hereto as Exhibit A is hereby confirmed, and Judgment is entered as follows:

    a. Plaintiff Shane Bourgeois is liable to Defendant The Pit Box, LLC on its counterclaims for compensatory damages in the amount of $217,191.39.

b. Pursuant to N.C.G.S. § 24-5, interest shall accrue at the North Carolina statutory rate of 8% per annum from entry of this Judgment until satisfied.

c. Once this Judgment is satisfied, The Pit Box, LLC shall be wound up in accordance with the Arbitrator's Award.

d. This Judgment shall be recorded, docketed, and enforced as any other judgment in a civil action.

e. Each party shall bear its own counsel fees and costs.

**SO ORDERED**, this the 18th day of March, 2025.

/s/ Julianna Theall Earp

Julianna Theall Earp
Special Superior Court Judge
 for Complex Business Cases

# EXHIBIT A

STATE OF NORTH CAROLINA          GENERAL COURT OF JUSTICE
COUNTY OF IREDELL                SUPERIOR COURT DIVISION
                                     File No. 21 CVS 89


SHANE BOURGEOIS and PITBOX
AUTO SALES, LLC.,

     Plaintiffs,

vs.                                     ARBITRATION AWARD and REPORT
                                          TO THE SUPERIOR COURT
JAMES MATTHEW LAPELUSA, JR.,
BRIAN PERRY, RALPH ERSKINE
STEVENSON, III., THE PIT BOX, LLC.,
and AMERICAN AUTOMOTIVE GROUP,
INC.,

     Defendants.

_____


     This MATTER comes on before the undersigned arbitrator for a final hearing conducted on September 12 – 13, 2024, for purposes of adjudication and the entry of an award and report to be transmitted for consideration by the Superior Court assigned Complex Business Cases in Iredell County.

## Counsel

     Claimant Shane Bourgeois appears on behalf of himself and Pitbox Auto Sales, LLC. Both are represented by Attorney David P. Parker, Esq. with the Harbinson Parker Law Firm.

     Respondents James Matthew Lapelusa appearing on behalf of himself and American Automotive Group, Inc., Brian Perry, Ralph Erskine Stevenson, III., and The Pit Box, LLC., a joint venture. All Respondents are represented by attorney Gilbert J. Andia, Esq. with the Higgins Benjamin Law Firm.

## Parties

     Claimant Shane Bourgeois is a citizen and resident of Iredell County, North Carolina and a Member Manager of Pitbox Auto Sales, LLC ( hereafter "PAS").

     Claimant entity, identified as Pitbox Auto Sales, LLC. is a North Carolina limited liability company organized on November 24, 2014. Its owners are Shane Bourgeois and a family member.

     The Respondent entity identified as The Pit Box, LLC ( hereafter "PB" ) is a North Carolina limited liability company organized on April 10, 2014 by Attorney John Hanzel for Claimant Bourgeois and whose registered agent was The Law Office of Ralph E. Stevenson, III., LLC. Claimant Bourgeois and Respondent Brian Perry were its owners Member Managers through 2015

1

– 2019. PB was the name of the joint venture Claimants and Respondents formed in December of 2019.

Respondent James Matthew Lapelusa, Jr. is a citizen and resident of Mecklenburg County residing in Cornelius, North Carolina.

Respondent Brian Perry is a citizen and resident of Mecklenburg County, North Carolina and a Member Manager in the entity identified as The Pit Box, LLC which was organized on April 10, 2014.

Respondent entity identified as American Automotive Group ( hereafter "AAG" ) is a North Carolina corporation incorporated on February 3, 2025. Its registered agent is The Law Office of Ralph E. Stevenson, III. PLLC. Its President is James LaPelusa and listed place of business is Mooresville, North Carolina. Pelusa and Bill Garness were the sole shareholders and officers until Garness released his shares in 2019. Respondent Lapelusa is its representative in this action.

Respondent and Attorney Ralph Erskine Stevenson, III. ( status as individual or corporate officer ) is no longer a party in this case. He was removed as a party Respondent by the entry of a Summary Judgment award in his favor entered on June 13, 2024 dismissing the case against him with prejudice. During the time of the events in question Stevenson was a voting Member of The Pit Box with no financial interest subject to the recovery or award of damages.

## Jurisdiction

The captioned case number herein, 21 CVS 89 originated with a filing in the North Carolina Superior Court in Iredell County on January 13, 2021. The case was assigned to the Special Superior Court Judge for Complex Business Cases Julianna Theall Earp.

The parties filed a Motion to Dismiss, Motion to Dismiss Ralph Stevenson, and Plaintiff's Motion to Amend and Supplement the Complaint with the Business Court.

On September 23, 2022 Judge Earp entered an order both granting and denying relief to the parties such that the case continued.

On August 11, 2023, and during the course of the proceedings the parties jointly moved the Court for an order referring the case to arbitration on certain identified issues in this action pursuant to the provisions of Article 45C of the North Carolina Revised Uniform Arbitration Act.

On August 21, 2023, Judge Julianna Theall Earp entered a CONSENT ORDER REFERRING THE CASE TO ARBITRATION, as subsequently amended to adjust event scheduling issues addressing discovery, motion, and hearings subject to the following directives.

The parties stipulated that:

1. "The proceeding would be conducted by a sole arbitrator selected by agreement of the parties.

2

2. The provisions of Article 45C, N.C.G.S. 1-569.1 et seq of the North Carolina General Statutes shall govern proceedings in this case, and any review of an award by the Court; provided that:

    a. The discovery deadline previously ordered is extended to February 15, 2024.
    b. The parties stipulated that they "may depose either party".
    c. The records produced for CPA Bert Davis are all deemed admissible and the reports of Davis are admissible.
    d. Any party may issue requests for production of documents and records from any other party not previously produced through Discovery or to for or by CPA Bert Davis.
    e. Any Party may file dispositive motions up to March 15, 2024.
    f. Each Party shall pay their respective attorney fees; and
    g. The Arbitrator shall apportion the fees of Arbitration.
    h. The Court shall retain jurisdiction over the case, and any award rendered in accordance with N.C.G.S. 1-569.1 et. seq.

3. To the extent an issue or question has been resolved by an Order or ruling of the Court in the case to date, said Order or ruling is the law of the case, and shall apply in the arbitration and bind the Arbitrator, except that the Case Management Order deadlines are extended as set forth therein.

4. Issues for consideration and decision by the Arbitrator are:

    a. The Pit Box, LLC is judicially dissolved and the dissolution and winding up of the Pit Box, LLC pursuant to Chapter 57D, Article 6 of the North Carolina General Statutes is to be a subject of this arbitration with the Arbitrator having those powers delegated to the Court for winding up;

    b. Whether any of Defendants were unjustly enriched to the detriment of Plaintiff Shane Bourgeois or the Pit Box, LLC; and,

    c. Whether Plaintiff Bourgeois or Pit Box Auto Sales, LLC is liable to Defendants, or any of them, under the Counterclaims made by Defendants pending in this action." [ Pit Box Auto Sales, LLC asserts Counterclaims for: (1) Conversion – all Defendants; (2) Unjust Enrichment – Perry, ; (3) Breach of Fiduciary Duty – The Pit Box, LLC; (4) Constructive Fraud – Perry, LaPelusa, AAG; (5) Fraud – Perry, LaPelusa, The Pit Box, LLC.; (6) Declaratory Judgment as to rights of the parties to the assets, liabilities, and business of the Pit Box– all Defendants; (7) Derivative Action – The Pit Box, LLC.

The parties executed an Arbitration Agreement and Scheduling Order on March 7 - 8, 2024 conferring jurisdiction and engaging the undersigned to conduct the proceedings and prepare a report and award for submission to and consideration by the Court.

Scheduling orders and extensions were entered by the Arbitrator with the last extension granted on July 10, 2024. A final pre-hearing order was entered on September 11, 2024 after status

conferences confirming the date for the hearing and post hearing briefing schedule with the briefs to be submitted by October 14, 2024 and the entry of an award pursuant to the provisions of Article 45C Section 1-569.19 by November 15, 2024.

Post-hearing briefs, exhibits, and proposed orders were submitted on October 14, 2024 for consideration in the preparation of this Report and Award. The post-hearing briefs and proposed orders focus on the issues which counsel seek to be considered and addressed.

## Evidence

The parties agreed to a video hearing with strict time limits for the presentation of evidence in the format of submitted narrative affidavits, live testimony and spreadsheets concerning the joint venture which is the subject of this arbitration.

Claimant offered the testimony of Shane Bourgeois individually and in his capacity as a Managing Member of PB. Claimant submitted spreadsheets from his records keeping system descriptive of his position on the facts and financial operations of the joint venture. Claimant also submitted pages of bank documents in support of his spreadsheets.

Respondent offered the testimony of Jim Lapelusa individually and in his capacity as the sole shareholder of AAG. The accountant for AAG and the joint venture, Tammy Wilson ( hereafter "Tarini" ) testified and presented financial documents concerning the financial operations of the Pit Box joint venture ( or "PBJV" ). Respondents also submitted pages of documents in support of its position.

Respondent Brian Perry, Managing Member of PB with an interest in the joint venture did not testify.

Financial Reports and Summaries

Four financial reports and summaries were presented for consideration; two reports by the CPA Davis Forensic Group, one report by the Pitbox joint venture prepared by AAG accountant Tammy Tarini, and spreadsheets prepared for Shane Bourgeois supported by multiple pages of documents and bank records. Those spreadsheets and accompanying documents were not subject to review or the testimony by any accountant for purposes of aiding in the adjudication of this matter.

Those reports covered the operative period of time which was December of 2019 – December of 2020 with a few concluding submissions from 2021 as the parties terminated their relationship.

As to the Davis 2023 Report and Tarini reports, access to Claimant's QuickBook Reports was "no longer possible" and that the "ONLY KNOWN" reports are for 2020 and were included in the FIRST report and were prepared by Ms. Tarini who prepared no reports in 2021. Financial data subsequently provided by Claimant in 2023 seeking a revision of the First Davis report and unaccompanied by any testimony from an accountant bears less weight. If the information was available in 2019, no doubt, it would have been provided to Davis for use in the preparation of his First Report in 2021.

A review of the four reports follows.

4

I.        Davis Joint Forensic Group Accounting Reports

(1) Claimants and Respondents jointly engaged the services of forensic accountant Bert Davis, a CPA with the Davis Forensic Group, LLC. ( hereafter "CPA"), to review and prepare a Report for the Members of The Pit Box, LLC in the matter of the Dissolution of The Pit Box, LLC from the financial records of PB as well as AAG.

The Davis Forensic Group ( hereafter "Davis")  prepared two reports authorized by the parties. Both Davis reports are incorporated by reference.

First Davis Forensic Accounting Report

The *First Davis Report* was issued on June 30, 2021. It contained this preface.

"Davis was originally asked to prepare financials statements and a complete accounting for both companies, which Davis declined to do. Davis did agree to review issues raised and attempt to verify the answers provided by the parties. That review was not possible for every issue. To the extent that review was possible, it is discussed below."

"The scope of the first engagement provided that the CPA "was engaged to provide an accounting of The Pit Box, LLC including all assets and liabilities to assist in the contemplated dissolution of the business" which is the subject of this case."

Examination of The Pit Box Financial Documents

"The Investigation Methodology consisted of  "reviews and analyses of the following: (1) financial documents of The Pit Box; ( 2) Pit Box's QuickBooks Online accounting system; (3) Pit Box's BB&T bank account statements provided by Truist Bank under subpoena; and (4) the financial documents of American Auto Group".

The CPA interviewed Mr. LaPelusa and Ms. Tammy Tarini." Bourgeois declined."

The CPA "FINDINGS" for the first report reflects the amounts provided for assets and liabilities. They "have not been audited in accordance with generally accepted accounting principles, nor are they presented in accordance with generally accepted reporting standards. The presentation, while accurate to the degree possible, reflects the limitations on the data provided."

Having reviewed and considered the evidence presented from the records and testimony of the witnesses, concerning the financial condition of The Pit Box, LLC as of December 31, 2020, the undersigned makes these findings from the joint Davis Reports.

Assets and Liabilities

*As to Assets of The Pit Box, LLC:*

(1) Pit Box overstated cash in the amount of $1,282.15, a negative;

(2) Pit Box possessed a total value of tools of $10,750.00 based upon the accepted valuation by the joint venture accountant, Tammy Tarini and Brian Perry who used the tools in the repair and reconditioning part of the business;

The Total Assets of The Pitbox, LLC at the end of 2020 were $ 9,467.85.

*As to Liabilities of The Pit Box, LLC:*

(1) The Pit Box had a liability for $2,661.25 for Snap-On tools it purchased;

(2) The Pit Box, had a liability of $80,476.26 to AAG; however, the amounts were not verified beyond the income statements. The accounting records of AAG prepared and provided by accountant Tammy Tarini ( Wilson ) are accepted as credible by the greater weight of the evidence;

(3) The SBA issued a loan to The Pit Box originated by Bourgeois without the knowledge of the other owners in the amount of $124,800.00. That loan was deposited in The Pit Box, LLC BB&T account controlled by Bourgeois and then transferred by Bourgeois into a personal BB&T account. This loan is not treated as a liability.

The Total Liabilities of the Pitbox, LLC at the end of 2020 were $207,937.51

| Assets - unaudited | |
|---|---|
| Cash | ( 1,282.15 ) |
| Tools – estimated current value | 10,750.00 |
| | |
| Total Assets | 9,467.85 |
| | |
| Liabilities – unaudited | |
| LKN Tools | 2,661.25 |
| American Automotive Group | 80,476.26 |
| SBA Loan | 124,800.00 |
| | |
| Total Liabilities | 207,937.51 |

Based upon this review as confirmed by the evidence of assets and liabilities, The Pit Box, LLC is insolvent and subject to dissolution as directed by the Court.

Revenues

As to Revenues of the Pit Box, LLC during 2020, based upon the evidence, there were cash revenues which Bourgeois did not report. The record is replete with credit card reporting issues throughout the duration of the existence of the entity as noted in the Tarini monthly financial summaries discussed by the owners of the venture at their monthly meetings. Before the venture started, LaPelusa had been paying Bourgeois and Perry $20,000.00 per month for repairs and reconditioning. Respondents from discussions understood the pre-joint venture Pit Box had revenues of over four hundred thousand dollars a year.

6

After the venture started in January of 2020, the first month of operations had reported income of $21,412.91. Monthly reported revenues for the joint venture never exceeded $10,000.00 per month thereafter for eight of the months and approximately thirteen thousand dollars a month for three of the months. The cost of goods sold figures fluctuated and exceeded the value of reported services provided on at least two months indicative of providing services for free. The Davis report noted that "there were no cash or check deposits for sales." And "While cash sales would not necessarily be the largest source of sales, it is unreasonable to think that there were no cash sales".

As to the PB revenues, based upon the Tarini records as tested in the *First Davis Report*, the following revenue sources are accepted as credible as to the amounts provided and reported by Claimant; however, to the extent the cost of goods sold figures submitted were valid, they support the provision of services which should have resulted in the generation of additional monthly income for the PB joint venture.

| Credit card revenue | |
|---|---|
| Merchants Bank Deposits | 104,933.45 |
| | |
| Debit card refunds | 1,151.45 |
| | |
| Transfers from other accounts | |
| BB&T account 4418 | 1,545.00 |
| BB&T account 1847 | 4,038.57 |
| | |
| Small Business Association | |
| Grant | 1,000.00 |
| | |
| Total | $112,668.47 |

Total Revenues as reported by Claimant to the joint venture were $112,668.47.

Expenses

As to Expenses, based upon the Tarini records as tested in the first Davis report, the following statement of expenses is accepted as credible:

(a) The Total expenses for the year 2020 exceeded $235,600.16.

(b) Of that amount $153,149.88 of those expenses could not be verified nor could a breakout of personal expenses be determined so they are classified as unknown personal expenses of Bourgeois.

(c) Of that amount there were $8,200.00 in expenses associated with the personal use of a USAA credit card assigned the business for which there is no documentary support such that that amount is characterized as a loan to PitBox or distribution to Mr. Bourgeois. In the absence of evidence at the hearing concerning a distribution, this amount will be charged as loan to be repaid by PitBox by Bourgeois.

7

(d) The Pit Box had other BB&T accounts from and to which transfers of $141,358.00 in unknown expenses were made by Bourgeois without the knowledge of Tarini or the other owners of The Pit Box. From BB&T account 4,756 transfers were made to accounts by Bourgeois to BB&T accounts 1376, 5246, 4418, and 1847.

| Total Expenses of Pit Box | 235,500.00 |
|---|---|
| | |
| *Unknown Expenses* | |
| Individual expenses without supporting data | 153,149.88 |
| USAA credit card payments for Bourgeois | 8,200.00 |
| Transfers from Bourgeois BB&T account 4756 | 141,358.00 |
| Transfers to BB&T accounts 1376, 5246, 4418, 1847 | |

Based upon this review as confirmed by the evidence of revenues and expenses, The Pit Box, LLC is insolvent and subject to dissolution as directed by the Court.

## Second Davis Forensic CPA Report

Davis "was engaged to provide verification of certain amounts related to the matter of the dissolution of The Pit Box, LLC ( "Pit Box").

The *Second Davis Report* was issued on April 27, 2023 after Claimant sought to provide additional information for consideration by the forensic accountant Davis. That data was tested by Davis who did not change his First report; however, he identified a number of issues which were left to a fact finder due to the lack of reliable data upon which he could give a professional opinion.

## Examination of AAG and PitBox Financial Documents

The Investigation Methodology used by CPA Davis consisted of "reviews and analyses of the following: (1) the "Davis first report and exhibits prepared in 2021; (2) Bank statements and cancelled checks for American Automotive Group, Inc. ( "AAG") accounts; (3) Bank statements and cancelled checks for Pit Box accounts; (4) Credit card statements for AAG; (5) Spreadsheet prepared by counsel to Mr. Bourgeois documenting payments to principals of both companies, which was tested for accuracy; and, (6) Financial statements for AAG prepared by Ms. Tammy Tarini; accountant for AAG.

"The issues below are identified by the number that corresponds to the numbers in Exhibit 2.
Pit Box, LLC

1. PB Joint Ventures issues.

   1a. Assets, liabilities and each Member's equity and capital accounts as of each 12/18/2019, 12/16/2020, and 7/12/2021. No calculation of each members' capital account was provided to Davis and therefore could not be verified. A series of spreadsheets prepared by counsel to Mr. Bourgeois showing payments to the members and Ms. Tammy Tarini are included as Exhibit 4. A sample of amounts in each of these spreadsheets were tested for accuracy with no exceptions noted. Beyond that, there is no basis for a determination of the capital accounts due to not having verifiable opening account balances and payments in Exhibit 4 not being segregated between distributions and reimbursed expenses.

8

1b. Monthly accounting for May and June of 2020 (the months when the SBA loans and Bourgeois floor planning occurred. Davis's first report includes a monthly profit and loss calculation for Pit Box for 2020 which identifies May and June separately. Balance sheets for Pit Box and income statements for AAG for these months are included as Exhibit 5.

1c. *What were the Loans from and Payments or Distributions to Pit Box Members made either directly to or on behalf of the LLC Members by either AAG or the Pit Box during the period from 12/18/2019 through 7/12/2021.* As noted in Item 1a above, all payments to members are included in the Exhibit 4 spreadsheets. The members will have to determine whether any of the payments were for loans, payments or distributions.

1d. *Are the 2019, 2020 and 2012 Pit Box Tax Returns accurate?* According to counsel for Mr. Bourgeois, tax returns for these periods have not been prepared.

1e. *Are the 2019, 2020 and 2021 Pit Box QuickBooks Reports accurate regarding the period from 12/18/2019 through 7/12/2021?* Access to QuickBooks online for Pit Box is no longer possible. The only known reports are for 2020 and are included in the First report and were prepared by Ms. Tarini. Ms. Tarini reports that she did not do any accounting for Pit Box for 2021.

1f. *Does Pit Box have any bank or other financial institution account following the closing out of its Bank of America account in January 2021*? This question should be answered by Mr. Bourgeois.

2. American Auto Group, Inc. issues

2a. Loans and Loan balances from Pit Box Members to AAG as of each 12/18/2019 and 7/12/2021. There are no balance reports specific to the dates in this item. Ms. Tarini provided AAG year-end balance sheets for 2020, 2021 and 2022 (See Exhibit 6). According to these balance sheets, there are no reported loans from Pit Box members to AAG.

2b. Payments to or (on) behalf of and distributions to Pit Box Members to AAG as of each 12/18/2019 and 7/12/2021. As noted in Item 1a above, all payments to members are included in the Exhibit 4 spreadsheets. The members will have to determine whether any of the payments were distributions.

2c. Complete deal flow including price, sales price, repairs and other expenses related to each vehicle the Bourgeois either floor planned or sold as Pit Box Auto Sales through AAG. Since the members are in disagreement regarding the facts and circumstances regarding the cars in question, Davis declines to provide analysis or verification for this item.

2d. Net profit on each vehicle sold by AAG from 12/18/2019 through 7/12/2021 (in addition to Bourgeois/Pit Box Auto Sales vehicles in prior question). Since the members are in disagreement regarding the facts and circumstances regarding the cars in question, Davis declines to provide analysis or verification for this item.

2e. Cash sales of each vehicle sold by AAG from 12/18/2019 through 7/12/2021. Since the members are in disagreement regarding the facts and circumstances regarding the cars in question, Davis declines to provide analysis or verification for this item.

2f. External Account Transfers made by AAG from 12/18/2019 through 7/12/2021 ( in addition to Bourgeois/Pit Box Auto Sales vehicles in prior question ). Counsel for Mr. Bourgeois has prepared two spreadsheets of unexplained AAG checking account items included as Exhibit X.

2g. *Were Shane Bourgeois or Brian Perry or both paid back for the vehicles each titled to AAG in 2019?*  Since the members are in disagreement regarding the facts and circumstances regarding the cars in question, David declines to provide analysis or verification of this item.

2h. *Was Shane Bourgeois paid back for the vehicles that he "floor planned" by financing the vehicles for AAG by paying off the exiting commercial floor planning by AAG in May of 2020?* Since the members are in are in disagreement regarding the facts and circumstances regarding the cars in question, David declines to provide analysis or verification of this item.

2i. *Of the three vehicles listed at being "Outside of 2019 Loan and outside of May 2020 Floor planning" and who is owned how much on each vehicle?* Since members are in disagreement regarding the facts and circumstances regarding the cars in question, David declines to provide analysis or verification of this item."

## II.      The Bourgeois Financial Spreadsheets

Claimant Bourgeois presented  separate spreadsheets including bank records detailing his positions on the issues in controversy and from which he testified. Data  additional to that examined by CPA Davis or the accountant for the joint venture, Tammy Tarini, or any witness with accounting background appears in those spreadsheets. It was not tested by an accountant prior to presentation as to its validity or conformity to accounting standards for purposes of comparison with the reports of Davis and Tarini.

The parties submitted no audited financials for consideration by the undersigned. Suffice it to say, the forensic accountant engaged by the parties, having reviewed what they presented to him, found that the financial records were inadequate and insufficient to serve as a basis for rendering a comprehensive professional opinion on those financials. That is the same information presented to the undersigned for use in answering the questions posed by the CPA. Accordingly, what the numbers meant and how they related to the issues in controversy is a matter of the interpretations and opinions of the parties as weighed by the undersigned.

## III.      The Tarini Financial Report

Respondents AAG and Lapelusa  presented records of the PB joint venture made by Tammy Tarini, who holds a BA and MBA in accounting; has been in the business thirty-five years, has experience in corporate receivership accounting and court-appointed auditing work. Tarini prepared the PB documents at the direction of Lapelusa who also engaged her as the AAG accountant.

Tarini documented her ongoing efforts during the period of January 2020 – December 2020 in working with the parties to ensure that the records met accounting documentation standards. The Tarini financial records consist of journal entries, financial records including profit and loss statements and balance sheets, monthly owner meeting reports, and documents concerning the formation and dissolution of the joint venture. Tarini also provides a  summary of the 2020 Pay Distribution to the Owners Bourgeois, Perry, and Lapelusa.

Accountant Tarini had frequent individual contact with the joint venture owners. Tarini held monthly executive meetings with them to discuss compliance and best practices to ensure that the

joint venture books were accurate. From the inception she was unable to get the owner Bourgeois to provide the detail backup paperwork necessary to prepare reliable financials and there was a lack of attention to routine banking matters. By way of an example, the failure of Bourgeois to submit banking records to her and follow accounting procedures led to the assessment of $10,189.13 in non-sufficient fund assessments by the bank against the joint venture in 2020.

The entirety of the submissions by the parties constitutes the record for purposes of this Award. A chronology of joint venture events with activity relevant to the financial issues in controversy follows. The evidence is insufficient to permit the undersigned to definitely determine revenues, expenses, and the financial condition of the parties. The undersigned can report findings and conclusions based upon some of the evidence provided by each party to this controversy.

## Joint Venture Chronology

### Pre-venture Party Business Models

Prior to the formation of the PB – AAG joint venture ( hereafter "joint venture" or "JV" ) in 2020, both parties were engaged in separate but related aspects of the wholesale and retail automobile repair, sale and resale business.

PB was primarily engaged in the businesses of (a) purchasing and selling cars in wholesale market by Shane Bourgeois and (b) repairing and reconditioning automobiles purchased from auto auctions or from individuals for the wholesale market or for automobile retailers in need of these services by Brian Perry. PB did not operate a retail auto sales business.

PB's finances were managed by Bourgeois using a PB account at Branch Banking & Trust ( hereafter "BB&T") as well as a personal account. Bourgeois kept his own books using QuickBooks and bank statements. Bourgeois also had separate BB&T accounts which he also used to move money around including an account for Pit Box Auto Sales, LLC.

AAG was engaged in the licensed and regulated business of retail auto sales of pre-owned vehicles financed using a floor plan. As part of its business model, it offered sales and post sales service contracts; however, it had to hire out and pay third parties, such as PB, for repairing and reconditioning the vehicles offered for sale. AAG spent approximately $20,000.00 dollars a month with PB for repair and reconditioning services. AAG's finances were managed by Lapelusa using an AAG account at Bank of America ( hereafter "BAC"). AAG used the services of the accountant Tammy Wilson who would later set up and maintain the books of the joint venture.

AAG saw an opportunity to achieve efficiency and profits if the repair, reconditioning, wholesale and retail sales operations could be merged into a single business and it approached Claimants.

### Formation

In December of 2019, on behalf of AAG, Lapelusa approached Bourgeois, on behalf of PB to discuss a joint venture.

At that time, both Parties had financial challenges. PB had cash flow issues from Bourgeois's operations. Lapelusa had severe financial pressures due to the embezzlement of funds from the

business by his former partner which created floor plan pressures and the need to retire other business debt. AAG owed its floor plan seventy-nine thousand dollars ( $79,000.00 ) at that time.

Neither side fully disclosed its business situation during the discussions of the joint venture.

Notwithstanding these challenges, discussions continued and in December of 2019 in furtherance of their intentions Managing Members Bourgeois and Perry of PB signed A Resolution of the Member Managers of The Pit Box, LLC ( hereafter "PB Resolution" ) declaring an intention to enter into a Management Agreement with AAG, Inc. and to recall all membership interests and reissue membership interests in PB as follows: Bourgeois at 30%; Perry at 30%; LaPelusa at 30% and Attorney Stevenson at 10%. It was attested to by Pelusa and Attorney Stevenson.

Contemporaneously, LaPelusa as President of AAG signed a Resolution of the President and Sole Stockholder of American Automotive Group, Inc. to Enter Into a Management Agreement with the Pit Box, LLC. ( hereafter "AAG Resolution" ). That resolution provided for the entry into a management agreement "for purposes of combining efforts" of AAG and PB with the same membership interests as provided in the PB Resolution. It was executed by Pelusa and Attorney Stevenson.

On or about April 18, 2020, an annual report was filed for PB identifying Bourgeois and Perry as "Executive Officers" and LaPelusa as "Executive Manager". Stevenson, PLLC was listed as the registered agent; however, no Management Agreement or operating agreement was ever signed by all of the parties.

Business Operations Model

The parties agreed on the basic structure of the intended relationship between Mr. LaPelusa, Mr. Perry, and Mr. Bourgeois. Mr. LaPelusa was to run, and remain the only shareholder of, the retail car sales lot (American Automotive Group); profits of AAG were to flow into a "new Pit Box" a joint venture whereby The Pit Box, LLC was to be owned by the three Parties.

Bourgeois and Perry agreed to merge their Pit Box entity into a new, joint venture with the name of Pit Box, LLC.

Notwithstanding the lack of a written operating agreement, the parties discussed a business plan including (a) the joint venture *operational model* managed by AAG, (b) *capital contributions*, (c) the *accounting system* to keep records of business activity and financial transactions, and (d) a monthly schedule for *draws* to owners. They operated under this arrangement until the end of the relationship in December of 2020. At any time, either could have ceased doing business and dissolved the entity and gone their separate ways.

For the *operational model*, the parties agreed to call the joint venture Pit Box, LLC ( PB ). Under the terms of the arrangement, Perry would continue to operate an automotive repair and reconditioning business previously run by Perry and Bourgeois under the Pit Box Auto Sales, LLC and Pit Box, LLC entities. Under the arrangement, the joint venture would use the Pit Box, LLC name, and PB would provide repair and reconditioning services for AAG at a preferential rate. This rate would be accounted for in its retail sales and captured as profits to be distributed to the joint venture owners Bourgeois, Perry, and Lapelusa on a monthly basis if revenues were available. The new venture would also engage in the purchase of wholesale vehicles which it would floor plan via

AAG. PB and AAG would each deposit the proceeds from the sales of their services and automobiles into a joint venture account.

## Capital Contributions

The parties discussed *capital contributions* for the joint venture. AAG and PB would both contribute equally to start the venture. The evidence supports the following description of capital contributions from those with ownership interest in the joint venture:

( i ) PB venture owner Brian Perry transferred a RAM truck with a MSO ( Manufacturer's Statement of Origin ) from the original manufacturer, which was identified as his, with a value of $37,500.00, into the PB venture. The truck was then assigned to AAG as collateral for the floor plan.

( ii ) PB venture owner Shane Bourgeois made a contribution of the value of $37,500.00 in the form of two automobiles, a Lexus 460 valued at $20,000.00 and a Razor valued at $17,500.00. Based on this tender, AAG floor planned both vehicles. Bourgeois did not disclose that he owned neither automobile until later when he disclosed that the vehicles were financed.

( iii ) PB venture owner James Lapelusa initially contributed equity, business management, and account services, the value of which was not established, as well as $75,636.41 to the venture from a personal securities account. Those funds were associated with his efforts to keep AAG solvent for floor plan purposes.

(iv) The Pit Box, LLC contributed tools of a value of $10,750.00 as per the Davis report.

(iv) PB venture owner, Stephenson made no financial contribution but provided legal services to which no value was assigned such that he had no equity interest.

## Summary of Capital Contributions

| Party | Type | Value |
|---|---|---|
| | | |
| 1. Bourgeois | Two vehicles | $37,500.00 |
| 2. Perry | One vehicle | $37,500.00 |
| 3. The Pit Box, LLC | Tools | $10,750.00 |
| 4. Lapelusa | Money | $75,636.41 |
| | Equity associated with management ( Indeterminate ) | 0.00 |
| | | |
| Total Capital Contributions | | $161,386.41 |

## Accounting System

Before and after the commencement of the PB joint venture in January of 2020, the parties discussed the accounting system and operated under this arrangement: (a) an accountant ( Tammy Tarini ) would set up and manage the books for the PB joint venture; (b) the existing repair and reconditioning business of PB conducted by Bourgeois and Perry would be operated under the new PB joint venture; (c) the work it did for outside customers as well as AAG would be included in that venture; (d) records of this work would be turned over to the accountant Tarini so that she could

maintain the books; (e) AAG would set up a separate Bank of America account in the name of the joint venture would be set up to handle the money with a USAA debit card issued to Bourgeois; (f) Tarini would set up a separate EIN for the PB venture and for purposes of distributions, the owners were classified as independent contractors with 1099 forms; (f) AAG would loan the PB joint venture money for operating costs should there be a shortfall in is revenue; (g) Bourgeois, Perry, and Lapelusa would each be paid draws of approximately $2,000.00 - $5,000.00 a month so long as there was revenue.

PB was to submit its books and support details to the joint venture accountant Tarini.

The parties agreed that PB was short of *cash flow* and that AAG would pay money to the owners to cover operations in the event PB was not generating sufficient revenue.

Unfortunately, soon after the commencement of business, the accounting system was not implemented because: (a) the accounting systems of the pre-joint venture PB under the ownership of Bourgeois and Perry were not merged; (b) the pre-joint venture maintained a separate set of books and bank accounts with BB&T managed by Bourgeois; (c) Bourgeois set up personal accounts at BB&T in which proceeds were commingled; (d) Bourgeois did not provide documentation of the operational transactions or charges on the USAA debit card which permitted the accountant to set up a set of books consistent with accounting standards; and (e) financial transactions in the form of government loans were made by individual owners without the knowledge or authority of the owners of the new entity. In short, there was no complete operational or financial merger of PB into the joint venture.

Mere weeks after the formation of the joint venture the relationship of the parties began to deteriorate from lack of communication and perceptions that each had failed to disclose material information before entry into the relationship. Regardless, the parties did not terminate the relationship until December of 2020 with continued exchanges into 2021.

In monthly meetings, the accountant brought these deficiencies to the attention of Bourgeois, Lapelusa, and Perry and recommended practices which would bring the records into conformity so that an accurate picture of the business operations was possible. It was apparent from a cursory examination of the information provided that PB revenues fluctuated significantly from the history of the relationship and that cost of goods sold numbers did not appear consistent with revenues, in some instances, exceeding the generated revenue.

There were significant unexplained or undocumented expenses submitted by PB to the joint venture. The accounting deficits resulted in AAG making loans to the joint venture which might have been unnecessary had understandable records been kept.

Notwithstanding repeated notice of these problems given by the accountant, no action was taken by Bourgeois, Perry, Lapelusa, AAG, or the PB joint venture during its existence.  No action was taken to bring the conduct of the financial operations into conformity with generally accepted accounting standards.

As a result, this controversy arose and the parties involved two accountants; one jointly and one separately, to parse the records. The inadequacies of the record keeping system were such that the accountants would not render opinions and this produced the need for findings concerning the

financial condition and responsibilities of the parties to this action. Record keeping failures further prevented the filing of timely tax returns. As a result, there are liabilities including unpaid taxes to the federal government that both PB and AAG are insolvent.

The parties operated under this arrangement and made distributions from the cash flow through the stresses of the COVID pandemic until the relationship deteriorated and the joint venture failed. On December 16, 2020, a majority of the owner-members, including Brian Perry, as a Managing Member of The Pit Box, terminated the management agreement with AAG and ceased operation of the joint venture. This action was taken as Bourgeois agreed to take a medical leave of absence to address issues associated with personal substance abuse, depression, alteration of documents, a false theft report, theft of cash, forgery of corporate checks, and redirection of joint venture income to his personal accounts.

Neither entity generated a profit after operational expenses and ownership distributions. The PB joint venture entity was dissolved by the Court and AAG is insolvent.

<u>January 2020 Formation – December 2020 Termination Joint Venture Events Summary</u>

The joint venture monthly records kept by Accountant Tarini are reliable sources of information concerning the PB activity.

Those records show the following with transfers and expenses, always exceeding deposits ( income ) for the entirety of the joint venture.

*January of 2020*

Income generated by the car repair facility was deposited into a Bourgeois BB&T account in the amount of $21,412.91 with cost of goods sold representing about 30% of that figure. That monthly income figure exceeded that which was paid in all of the subsequent months of the business notwithstanding representations that PB had made as much as $417,000.00 per year. Mr. Bourgeois paid unknown/unjustified expenses without detail in the amount of $12,178.92 and transferred the total of $4,225 into other accounts controlled by him. In addition to other expenses bank charges of $1,306.45 were incurred due to his inattention. Since the income exceeded the "expenses paid" and the "transfers", AAG loaned the joint venture *$7,034.96.*

After January of 2020, revenues from Pit Box never reached $20,000.00 per month.

*February of 2020*

Income generated by the car repair facility was deposited into a Bourgeois BB&T account in the amount for the entire month of operations of $6,680.68 with cost of goods sold representing over 60% of that figure. Mr. Bourgeois paid unknown/unjustified expenses without detail in the amount of $3,208.30. In addition to other expenses, bank charges of $972.00 to the joint venture were incurred due to inattention. Since the income exceeded the "expenses paid" and the "transfers", AAG loaned the joint venture *$4,289.91* to cover basic operating expenses.

*March of 2020*

Income generated by the car repair facility was deposited into a Bourgeois BB&T account, not the joint venture account, in the amount for the entire month of operations of $7,648.02 with cost of goods sold representing over 104% of that figure. Mr. Bourgeois paid unknown or unexplained expenses without detail in the amount of $3,208.30. Bourgeois transferred $3,450.00 to other personal accounts. In addition to other expenses, bank charges of $720.00 to the joint venture were incurred due to inattention. Since the income exceeded the "expenses paid" and the "transfers", AAG loaned the joint venture *$9,763.89* to cover basic operating expenses with a loss of $10,072.82 for the month.

*April of 2020*

Income generated by the car repair facility was deposited into a Bourgeois personal BB&T account, and not the joint venture account, in the amount for the entire month of operations of $4,383.33 with cost of goods sold representing over 160% of income. Mr. Bourgeois paid unknown or unjustified expenses without detail in the amount of $ 7,057.00 with a loss of $10,451.82 that month. In addition to other expenses, bank charges of $ 1,374.00 were incurred due to Bourgeois's inattention to the business. Since the income exceeded the "expenses paid" and the "transfers", AAG loaned the joint venture *$10,451.82* to cover basic operating expenses. The owners discussed the need for Bourgeois to close his separate account to no avail.

*May of 2020*

Income generated by the car repair facility was deposited into a Bourgeois BB&T account, and not the joint venture account, in the amount for the entire month of operations of $ 8,181.94 with cost of goods sold representing over 130% of income. Mr. Bourgeois incurred unknown or unexplained expenses without detail in the amount of $ 126,505.16 and a loss of over ten thousand dollars. In addition to other expenses, bank charges of $ 468.64 were incurred due to Bourgeois's inattention to the business. Since the income exceeded the "expenses paid" and the "transfers", AAG loaned the joint venture *$10,442.73* to cover basic operating expenses. The owners discussed the need for Bourgeois to close his separate account to no avail.

It was in May of 2020 that Bourgeois approached Lapelusa, the joint venture manager representing that he had personal funds from refinancing his residence which he wished to personally invest with AAG in return for interest and principal payments of the loan. Bourgeois had taken out a $126,000.00 in EIDL loan and a personal loan in a total amount of $160,000.00 which he wanted to use to personally floor plan vehicles and receive income. He misrepresented the SBA loan as a personal one.

Based on the representations, Lapelusa agreed and vehicles were identified and placed under the floor plan. Subsequently the joint venture learned that the funds were not his personal funds but were some combination of SBA and personal loans. Nonetheless, the joint venture floor planned eleven vehicles using those proceeds and made principal and interest payments to Bourgeois.

Claimant provided over $160,288.00 using an SBA and personal loans for the floor planning of eleven vehicles approximating that amount of a value of $159,350.00. There is no dispute that

Mr. Bourgeois received $126,000.00 from an SBA EIDL Loan designated for The Pit Box. Mr. Bourgeois admitted that he received the loan proceeds during his testimony and in Responses to Interrogatories. Bank records demonstrate that SBA made two deposits into the BB&T banking account for The Pit Box on May 26, 2020 in the total amount of $125,800.00 and that Bourgeois transferred the total amount of $126,000 to his separate, personal BB&T business account on May 26, 2020 in the deposit entry SBAD TREAS 310. A personal loan making up the balance of the amount to be floor planned was in the amount of $34,288.00.

*June 2020*

Income generated by the car repair facility was deposited into a Bourgeois BB&T account, and not the joint venture account. Total reported income for the entire month of operations was $14,453.00 with cost of goods sold representing over 52 % of that amount. Mr. Bourgeois paid unknown or unexplained expenses without detail in the amount of $ 5,691.64 with withdrawals into his personal accounts of $4,038.00. The monthly loss was $6,625.23 dollars. In addition to other expenses, bank charges of $ 772.25 were incurred due to Bourgeois's inattention to the business and Bourgeois used the USAA credit card to pay expenses. Since the income exceeded the "expenses paid" and the "transfers", AAG loaned the joint venture the additional amount of *$13,615.82* to cover basic operating expenses.

The owners discussed the current reporting and documentation problems related to Bourgeois's use of the credit card and his separate control of a PB joint venture account at BB&T rather than using the agreed upon account at Bank of America without a resolution.

*July 2020*

Income generated by the car repair facility was deposited into a Bourgeois BB&T account, and not the joint venture account, in the amount for the entire month of operations of $ 5,240.00. It went into his account and from which he paid expenses with cost of goods sold representing over 40 % of income. Mr. Bourgeois paid unknown or unexplained expenses without detail in the amount of $ 5,211.15 for a monthly loss of $6,186.90 dollars. Since the income exceeded the "expenses paid" and the "transfers", AAG loaned the joint venture the additional amount of *$12,203.06* to cover basic operating expenses. The owners again discussed record keeping and the financial issues without a resolution.

*August 2020*

Income generated by the car repair facility was deposited into Bourgeois's BB&T account, and not the joint venture account, for the entire month of operations totalling $ 13,374.745.00. The cost of goods sold represented over 84 % of revenue. Mr. Bourgeois paid unknown or unjustified expenses without detail in the amount of $ 2, 932.65 with a loss of $10,462.33 dollars after expenses. NSF bank charges exceeded $1,274.00 that month due to his inattention. Since the income exceeded the "expenses paid" and the "transfers", AAG loaned the joint venture the additional amount of *$12,252.05* to cover basic operating expenses. Tarini's efforts to get back up data for Bourgeois's expenditures were unsuccessful notwithstanding the owner's discussions regarding placing a person at the PB location to keep records.

*September  2020*

Income generated by the car repair facility was deposited into Bourgeois's BB&T account, and not the joint venture account, in the amount for the entire month of operations of $ 5,901.22. That money went into his account from which he paid expenses. The cost of goods sold of $4,962.06 represented over 84 % of that income. Mr. Bourgeois paid  unknown or unjustified expenses without detail in the amount of $ 1,717.61 and a loss of $8,786.34 dollars after expenses. He made personal payments from the joint BP account including dating sites. NSF bank charges were $1,274.58 that month due to his inattention. Since the income exceeded the "expenses paid" and the "transfers", AAG loaned the joint venture the additional amount of *$9,725.50* to cover basic operating expenses. Tarini's efforts to get back up data for Bourgeois's expenditures were unsuccessful notwithstanding the owner's discussions regarding placing a person at the PB location to keep records. The owners failed to resolve the reporting issues between Bourgeois and the joint venture.

*October 2020*

Income generated by the car repair facility according to Bourgeois was deposited into his BB&T account, and not the joint venture account, for the entire month of operations totaled  $7,599.21. Those funds went into his account and out of which he paid expenses. The cost of goods sold of $3,540.49 represented over 46 % of that income. Mr. Bourgeois paid  unknown or unjustified expenses without detail totaling $ 409.44 for a loss of $2,936.34 dollars after expenses. NSF bank charges exceeded $1,549.00 that month due to his inattention. Since the income exceeded the "expenses paid" and the "transfers", AAG loaned the joint venture the additional amount of *$3,761.46* to cover basic operating expenses. Tarini's efforts to get back up data for Bourgeois's expenditures were unsuccessful notwithstanding the owner's discussions regarding placing a person at the PB location to keep records. The owners failed to resolve the reporting issues between Bourgeois and the joint venture

*November 2020*

Income generated by the car repair facility according to Bourgeois was deposited into his BB&T account, and not the joint venture account, in the amount for the entire month of operations of $ 12,426.47. Those funds went into his account from which he paid only a portion of the joint venture expenses. The cost of goods sold of $2,961.71 represented only 24 % of that income. Mr. Bourgeois paid  unknown or unjustified expenses without detail in the amount of $ 3,950.00. NSF bank charges were $432.00 that month due to his inattention. AAG loaned the joint venture the additional amount of *$7,084.54*  to cover basic operating expenses including $3,950 to pay Bourgeois on his USAA credit card.

In November that the PB joint venture manager Pelusa learned that Bourgeois had stolen money and forged a joint venture check. Bourgeois took two thousand in cash and checks totaling $4,038.45. The checks were deposited into a personal BB&T account of Mr. Bourgeois. Bourgeois admitted to taking the cash and forging the check and pleaded with Mr. LaPelusa not to report the incidents to the police. BB&T received the check and would not return it to the joint venture.

The confrontation about these thefts led to an apparent threat of suicide by Mr. Bourgeois and an intervention with Mr. Bourgeois's father and decision that Bourgeois, to avoid further problems, would take a medical leave from the joint venture and seek medical help.

By November of 2020 it was clear that the joint venture could not continue.

*December 2020*

While Bourgeois took medical leave from the joint venture, he still handled the books for the PB entity. Income generated by the car repair facility according to Bourgeois was deposited into his BB&T account, and not the joint venture account, in the amount for the entire month of operations of $ 3,002.79. Those funds went into his account and out of which he paid only a portion of the joint venture expenses. The cost of goods sold of $1,195.02 represented approximately 40 % of that income. There was a loss of $933.48 for the month and AAG loaned the joint venture the additional amount of *$3,936.27* to cover basic operating expenses including a payment of $3,950 on Bourgeois's USAA credit card. As of that month PB records reflect outstanding loans due to AAG totaling $89,269.37.

On December 6, 2020, a quorum of seventy-percent of the owners of the joint venture, consisting of Perry, Lapelusa, and Stephenson met and terminated the management agreement with AAG and formally dissolved the joint venture because they realized it was no longer viable.

Joint Venture Termination

Due to the failure to merge the operations and accounting systems for The Pit Box, LLC into the Pit Box Joint venture and the handling of its operational and financial affairs, the business failed. This was largely due to the failure of Claimant Bourgeois to help facilitate the merger notwithstanding the fact that AAG was experiencing financial difficulty. Because income was not being deposited into the bank account for the "new" Pit Box, there was not enough income to pay for the expenses of the "new" Pit Box. Throughout 2020, in order to cover the expenses, AAG had to put additional money into The Pit Box which Ms. Tarini booked as loans.

As established, and not disputed, AAG covered the operating losses of The Pit Box including paying various expenses (utilities, rent, office supplies, parts) for The Pit Box auto repair facility operated by Bourgeois and Perry. The final Balance Sheet for The Pit Box shows a note payable to American Auto Group in the amount of $89,269.47.

Mr. LaPelusa and Ms. Tarini testified that Mr. LaPelusa made loans to PB of personal funds in the amount of $75,636.41 as an additional capital contribution in an unsuccessful effort to keep the joint venture operative.

Articles of Dissolution for The Pit Box, LLC were filed with the North Carolina Secretary of State on December 16, 2020.

The parties to this action and counsel met in 2021 in an effort to wind up affairs.

As a result of the termination of the relationship, the final accounting records for the joint venture and AAG have not been completed and IRS tax forms have not been filed.

## I.      Dissolution Issue

The Court directed that the Report and Award address the issue of dissolution in its Order of August 21, 2023.

> "The Pit Box, LLC is judicially dissolved and the dissolution and winding up of the Pit Box, LLC pursuant to Chapter 57D, Article 6 of the North Carolina General Statutes is to be a subject of this arbitration with the Arbitrator having those powers delegated to the Court for winding up;"

The undersigned notes that the parties agree that The Pit Box is dissolved and the Court so determined subject to whatever "winding up" tasks remained to fulfill that mandate. In winding up, N.C.G.S. § 57D-6-07 provides that the person or persons charged with that task shall collect assets, dispose of property that will not be distributed in kind, discharge liabilities, and distribute the remaining assets.

During the hearing, both parties claimed that there were no assets to pay for a receiver. No evidence was presented that there are assets to be marshalled by a receiver, or that there are any obligations to be resolved by a receiver at this time. – other than a liability to the Small Business Administration.

Both the Joint Davis  Forensic Reports and Tarini records credibly, and by the greater weight, conclusively establish that Pit Box entity is not a going concern and that the Court's decision is justified and supported by the Dissolution filing with the North Carolina Secretary of State.

Accordingly, there has been no evidence presented that any of those tasks associated with "winding up" are necessary for The Pit Box, other than a determination of the financial obligations and entitlements of the members and entities inter se as claimed by the Petitioner's Claim and Respondents' Counterclaims.

## II.      Unjust Enrichment Issue.

The Court directed that the Report and Award address the issue of unjust enrichment in its Order of August 21, 2023.

> "4. Issues for consideration and decision by the Arbitrator are:
>
> b.  Whether any of Defendants were unjustly enriched to the detriment of Plaintiff Shane Bourgeois or the Pit Box, LLC; and,"

In the Post-hearing brief and proposed order Claimant contends that payments or disbursements for AAG and The Pit Box totaled $506,851.20; that Claimant received $66,613.40; and that Respondent Lapelusa received $231,939.20. Since disbursements by AAG were not supposed to be received by Claimant Bourgeois, just profits to be paid to the PB joint venture, the

Arbitrator cannot determine what disbursements are only attributable only to Pit Box. Claimant has failed to meet its burden of proof as to that amount.

Based upon the evidence considered, the undersigned concludes that Claimant was not unjustly enriched and is not entitled to recover from Respondents.

### III.    Counterclaim Issues

The Court directed that the Report and Award address the issues raised in the counterclaim in its Order of August 21, 2023.

"4. Issues for consideration and decision by the Arbitrator are:

   c.   Whether Plaintiff Bourgeois or Pit Box Auto Sales, LLC is liable to Defendants, or any of them, under the Counterclaims made by Defendants pending in this action." [ Pit Box Auto Sales, LLC asserts Counterclaims for: (1) Conversion – all Defendants; (2) Unjust Enrichment – Perry, ; (3) Breach of Fiduciary Duty – The Pit Box, LLC; (4) Constructive Fraud – Perry, LaPelusa, AAG; (5) Fraud – Perry, LaPelusa, The Pit Box, LLC.; (6) Declaratory Judgment as to rights of the parties to the assets, liabilities, and business of the Pit Box– all Defendants; (7) Derivative Action – The Pit Box, LLC."

Respondents dismissed the counterclaim by Perry, Lapelusa, and The Pit Box for fraud against Bourgeois for misrepresentations at the inception of dealings between the parties.

### Discussion of Applicable Claims

Respondents post-hearing brief and proposed order demands $ 310,666.53 dollars in damages from Claimant Shane Bourgeois for conversion of funds directed to his personal use; converting funds in breach of his fiduciary duties to receive interest and principal on an SBA loan in the amount of $112,055.92; conversion of funds in the amount of $6,038.45; causing the joint venture to make loans in the amount of $89,269.47 from AAG and unjustly enriching himself in that amount with a credit for $2,205.67 less in distributions and/or salary than Respondents Lapelusa or Perry. Respondent seeks a distribution of $4,038.45 to AAG and a distribution to the Pit Box, LLC a total sum of $210,947.27 to be distributed with $89,269.47 going to AAG; $40,559.27 to Brian Perry; $40,559.27 paid to James LaPelusa and $40,559.26 to be paid to Claimant Shane Bourgeois.

Respondents dismissed the counterclaim by Perry, Lapelusa, and The Pit Box for fraud against Bourgeois for misrepresentations at the inception of dealings between the parties.

While Respondents have established an entitlement to relief, based upon the evidence, the undersigned reaches the following conclusions concerning entitlement to damages and the amount due.

   1.   Claimant Bourgeois converted and misapplied proceeds over the twelve-month period of the joint venture in the amount of *$ 101,097.02* intended for the PB joint venture from his PB BB&T account to four personal accounts in derogation of his fiduciary

21

duty to the enterprise as per the Tarini records. He was unjustly enriched and the absence of these funds required the PB joint venture to borrow $ 89,269.47.00 from AAG.

2. Claimant received $126,000.00 from a SBA EIDL designated for The Pit Box and deposited in a Pit Box account. He moved these funds to a personal account and combined them with some $34,288.00 in personal funds to get a floor plan in the amount of $160,288.00 as a private investor in violation of his fiduciary duties to the joint venture. AAG paid him interest and principal in the amount of *$112,055.92.* This loan was rightfully the property of The Pit Box and the payments of principal and interest should be returned to The Pit Box.

3. Claimant Bourgeois also failed to document expenses in the amount of $153,149.88 as per the Davis Report. Some of these expenses would have been attributable to the PB joint venture. Based upon the data provided from all sources, that allocation is undeterminable. The PB joint venture accountant attempted to get the owners to compel better attention to detail from the inception of the enterprise. Despite this knowledge, the owners took no action to resolve this accounting issue and may be said to have ratified or accepted it as a practice such that no assessment of that amount to Bourgeois is directed.

4. Respondents demand seeking the return of *$ 8,200.00* intended for the PB joint venture associated with his mishandling of the USAA credit card in derogation of his fiduciary duty to the enterprise as per the Davis Report . The evidence is insufficient to confirm this number so that no assessment of that amount is made.

5. Claimant Bourgeois converted by forgery of a check and theft of money the sum of *$4,038.45* from AAG to which it is entitled.

In summary, having considered the weight and credibility of the evidence, the undersigned concludes that Respondents prevail on portions of its counterclaims concerning the PB joint venture and Claimant Shane Bourgeois owes the joint venture entity PB the sum of *$217,191.39* less setoffs as follows and provided herein.

### AWARD AND DISTRIBUTION TO THE PARTIES

There are inadequate resources to pay all claims. The undersigned identifies the following assets for distribution and makes the following distributions to wind up the matters in controversy. As part of the winding up process, the undersigned considered the following categories of claims to be recognized as part of a prioritization of distributions for funds received in satisfaction of this Award.

1. The total Pit Box Assets for Distribution are:

   A. Pit Box is entitled to recover from Claimant Bourgeois the sum of     $217,191.39

   B. Pit Box has ( in-kind ) tools worth     $10,750.00

| | |
|---|---|
| Total assets: | $227,941.39 |

2. There are insufficient funds to distribute to satisfy the claims of the parties. The undersigned makes the following distributions adjusting for the income and benefits the parties received during the joint venture and the capital contributions.

| | |
|---|---|
| Total assets: | $227,941.39 |

Less claims assessed against total assets

| | | |
|---|---|---|
| A. Recognition of the Personal loan of Bourgeois loans to the Pit Box ( $160,288- $126,000.00) | | ($34,288.00) |
| B. Recognition of the AAG loan to the Pit Box | | ($89,267.49) |
| Total remaining distributable assets: | | $104,385.90 |
| C. Capital claims | | |
| Less distribution of in-kind tools | | ($10,750.00) |
| Distribution to Bourgeois | ($5,375.00) | |
| Distribution to Perry | ($5,375.00) | |
| Less Equitable adjustment to Lapelusa | ($5,375.00) | |
| Total remaining distributable assets: | | $88,260.90 |
| D. Equal distribution among owners of joint venture | | |
| Bourgeois | ($29,420.30) | |
| Perry | ($29,420.30) | |
| Lapelusa | ($29,420.30) | |
| | | ($88,260.90) |
| Balance | | 00.00 |

3. There are no remaining assets available for distribution from the Pit Box account for the satisfaction of other claims of any of the parties.

4. The Pit Box is dissolved with the only remaining task being that of Respondent-distribution recipients setting up an account to make distributions as provided in this order upon satisfaction of the Award.

5. Claimant is not entitled to unjust enrichment relief from Respondents.

6. Claimant Bourgeois was unjustly enriched in the amount of *$217,191.39* which is to be distributed as per the AWARD AND DISTRIBUTION schedule herein. Net-net, after distributions, Claimant Bourgeois is liable for *$153,483.09.*

7. Distributions to the named parties, including Claimant, are to be made upon the payment in full of all of the claims identified and recognized herein.

8. Each of the parties identified and recognized for distribution purposes is entitled to a judgment in its favor of the amount awarded from Claimant.

9. There are no remaining assets available for distribution from The Pit Box account for the satisfaction of other claims.

10. All claims and/or issues raised herein and not addressed are deemed denied.

11. Each party shall bear its own counsel fees and costs.

12. Interest on the Award upon entry as a judgment is at the rate of 8% per annum.

13. Claimants and Respondent parties are responsible for the payment of an equal share for arbitration services associated with this case.

14. Counsel for the parties shall transmit this Award and Report to the Offices of Special Superior Court Judge for Complex Business Cases Julianna Theall Earp.

**IT IS SO ORDERED.**

This the 15th day of November, 2024.

*Chase B. Saunders*

_____
Chase B. Saunders,
Arbitrator